**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELIZABETH MOELLER, individually and on behalf of all others similarly situated,<br><br>                              Plaintiff,<br><br>      v.<br><br>AMERICAN MEDIA, INC. and ODYSSEY MAGAZINE PUBLISHING GROUP, INC.,<br><br>                              Defendants. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Elizabeth Moeller ("Plaintiff"), individually and on behalf of herself and all others similarly situated, by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## <u>INTRODUCTION</u>

1.        Defendants American Media, Inc. ("American Media")[1] and Odyssey Magazine Publishing Group, Inc. ("Odyssey," and collectively, "Defendants")[2] sold personal information about Plaintiff Elizabeth Moeller's magazine subscriptions to list brokers, including for example NextMark, Inc., which in turn sold her information to telemarketers and other aggressive advertisers.  As a result, Ms. Moeller is being inundated with a barrage of unwanted junk mail

---

[1] American Media is an international media company that publishes some of the most widely circulated magazines in the United States, including the *National Enquirer*, *Star*, *Muscle & Fitness*, and *Flex* magazines.

[2] Odyssey is a wholly owned subsidiary of American Media.  Odyssey publishes *OK!* magazine.

and telephone solicitations.  By selling Ms. Moeller's Personal Reading Information (defined

below), Defendants violated Michigan's Preservation of Personal Privacy Act, M.C.L. §§

445.1711, *et seq.* (the "PPPA").

2.      Documented evidence confirms these facts.  NextMark's website offers to

provide telemarketers access to the Personal Reading Information of 1,227,656 subscribers from

the "American Media Enhanced Mega Masterfile Mailing List" at a base price of "$110/M [per

thousand]," (i.e., 11 cents apiece).

# American Media Enhanced Mega Masterfile Mailing List

Published by American Media, Inc. This file is a deduped masterfile made up of all of the American Media Health & Fitness and Celebrity publications. Included are Muscle & Fitness, Muscle & Fitness Hers, Flex, Men's Fitness, Star, OK! Magazine, Soap Opera Digest, National Enquirer, National Examiner, and Globe. From celebrity gossip, to the Latino marketplace, and health & fitness for both men and women, the AMI Megafile brings new opportunities to reach the right reader, potential buyer and donor. Enhanced quarterly with lifestyle information the selection opportunity is endless.

Get Count    Get Pricing    Get More Information

| SEGMENTS | | COUNTS THROUGH 03/10/2016 | POPULARITY: | ▪▪▪▪ 97 |
|---|---|---|---|---|
| | 1,227,656 TOTAL UNIVERSE / BASE RATE | $110.00/M | MARKET: | CONSUMER |
| | 1,227,656 ACTIVE SUBS | $110.00/M | CHANNELS: | |
| | CATALOG RATE | $80.00/M | SOURCE: | DIRECT RESPONSE |
| | FUNDRAISER RATE | $75.00/M | PRIVACY: | UNKNOWN |
| **DESCRIPTION** | | | DMA?: | YES - MEMBER |
| (FORMERLY: AMI Megafile) | | | STATUS: | PREFERRED PROVIDER |
| | | | GEO: | USA |

| | |
|---|---|
| **SELECTS** | |
| 1 MONTH HOTLINE | $16.00/M |
| 3 MONTH HOTLINE | $11.00/M |
| 3RD PARTY BLOW-IN | $10.00/M |
| 6 MONTH HOTLINE | $5.00/M |
| AGE | $11.00/M |
| AREA OF INTEREST | $11.00/M |
| CREDIT CARDS | $11.00/M |
| ETHNIC | $15.00/M |
| GENDER/SEX | $10.00/M |
| INCOME SELECT | $11.00/M |
| PAID | $10.00/M |
| PET OWNERS | $11.00/M |
| SCF | $10.00/M |
| SOURCE | $10.00/M |
| STATE | $10.00/M |
| ZIP | $10.00/M |

**AMERICAN MEDIA, INC.**

Published by American Media, Inc.

This file is a deduped masterfile made up of all of the American Media Health & Fitness and Celebrity publications. Included are Muscle & Fitness, Muscle & Fitness Hers, Flex, Men's Fitness, Star, OK! Magazine, Soap Opera Digest, National Enquirer, National Examiner, and Globe.

From celebrity gossip, to the Latino marketplace, and health & fitness for both men and women, the AMI Megafile brings new opportunities to reach the right reader, potential buyer and donor. Enhanced quarterly with lifestyle information the selection opportunity is endless.

**ORDERING INSTRUCTIONS**

*See* Complaint Ex. B.

    3.    NextMark also offers access to the Personal Reading Information of Defendants subscribers based on "age," "income," "ethnic[ity]," "gender/sex," and whether the subscribers are "pet owners."

    4.    Defendants also offers access to their "Hispanic Database Mailing List" at the same base rate of "$110/M."

# American Media Hispanic Database Mailing List

Published by American Media, Inc. The American Media Hispanic Database reaches men and women of Hispanic descent who have direct purchasing power to buy the products they need for entertainment and everyday living.

**Get Count**   **Get Pricing**   **Get More Information**

| SEGMENTS | | COUNTS THROUGH 02/27/2015 |
| --- | --- | --- |
| 228,818 | TOTAL UNIVERSE / BASE RATE | $110.00/M |
| 228,818 | AMERICAN HISPANIC SUBSCRIBERS | $110.00/M |
| 132,636 | ACTIVE SPANISH SPEAKING | + $15.00/M |
| 33,586 | ACTIVE PUERTO RICAN | + $15.00/M |
| | CATALOG RATE | $80.00/M |
| | FUNDRAISER RATE | $75.00/M |

| | |
| --- | --- |
| POPULARITY: | ▪▪▪▪▫ 79 |
| MARKET: | CONSUMER |
| CHANNELS: | |
| SOURCE: | DIRECT RESPONSE |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | PREFERRED PROVIDER |
| GEO: | USA |

**DESCRIPTION**

Published by American Media, Inc.

The American Media Hispanic Database reaches men and women of Hispanic descent who have direct purchasing power to buy the products they need for entertainment and everyday living. The individuals in this list are subscribers to a variety of celebrity and health and fitness magazines published by American Media. These individuals purchase products ranging from housewares to electronics.

This consumer group often has ancestral roots in countries like Mexico, Argentina, Costa Rica, Columbia, El Salvador, Guatemala, Nicaragua, and Panama. They are ambitious business owners, executives, laborers, parents, grandparents, retirees, and students. They enjoy a rich, diversified culture steeped in tradition. They read America Media publications for articles and information on celebrity happenings, celebrity fashion trends and beauty secrets, physical fitness, body building techniques, flat abs and tummys, and nutritional meals and recipes.

As of 2013, the U.S. Census Bureau estimated the Hispanic population in the U.S. to be around 54 million, representing approximately 17% of the total population. The U.S. Hispanic population for 2060 is estimated to reach 128.8 million, constituting approximately 31% of the U.S. population. They have the purchasing power to buy computers, televisions, DVDs, home theater systems, music, food and beverages, cosmetics, jewelry, home furnishings, outdoor accessories, automobile accessories, weight loss products, nutritional supplements, sporting goods equipment, hair care accessories, apparel, footwear, and fitness attire.

Subscribers in the American Media Hispanic Database list are responsive to marketing offers from retailers, direct mail and email marketers, consumer publications, entertainment providers, event coordinators, credit card issuers, continuing education providers, housing developers, telecommunications providers, and food and beverage providers.

**ORDERING INSTRUCTIONS**

**SELECTS**

| | |
| --- | --- |
| 1 MONTH HOTLINE | $16.00/M |
| 3 MONTH HOTLINE | $11.00/M |
| 3RD PARTY BLOW-IN | $10.00/M |
| CREDIT CARDS | $11.00/M |
| GENDER/SEX | $10.00/M |
| INCOME SELECT | $11.00/M |
| LIFESTYLE | $11.00/M |
| PAID | $10.00/M |
| PET OWNERS | $11.00/M |
| PUBLICATION | $10.00/M |
| SCF | $10.00/M |
| STATE | $10.00/M |
| ZIP | $10.00/M |

**ADDRESSING**

| | |
| --- | --- |
| KEY CODING | $3.00/M |
| EMAIL | $100.00/F |
| FTP | $100.00/F |
| P/S LABELS | $10.00/M |
| RUN CHARGE | $10.00/M |

**RELATED LISTS**

- CONDE NAST - HISPANIC SUBSCRIBERS
- CONSUMER REPORTS
- CELEBRANDO HISPANIC PUBLISHERS
- SIEMPRE MUJER
- EASTER SEALS DIRECT MAIL DONOR MASTERFILE
- GUTHY-RENKER HISPANIC AND SPANISH SPEAKING MASTERFILE
- GRUPO NUEVO SPANISH CABLE TV SUBSCRIBERS
- SALESIAN MISSIONS HISPANIC DONORS
- PUBLISHERS CLEARING HOUSE MERCHANDISE BUYERS
- PLAYBOY MAGAZINE - ENHANCED MASTERFILE

*See* Complaint Ex. C.  For an additional "$15/M" over the base "$110/M" rate (i.e., 12.5 cents apiece), NextMark offers access to the Personal Reading Information of subscribers who are "Active Spanish Speaking" or "Active Puerto Rican."  *See id.*

     5.     Defendants also offers access to their "Practicing Catholics Database Mailing List" at the same base rate of "$110.00/M."

# American Media Practicing Catholics Database Mailing List

Published by American Media, Inc. The American Media Practicing Catholics Database reaches devout men and women of Catholic faith. They attend mass and church services on a regular basis and strive to live according to scripture. They purchase religious products ranging from Bibles to religious wall decor.

**Get Count**   **Get Pricing**   **Get More Information**

| SEGMENTS | | |
|---|---|---|
| | COUNTS THROUGH 09/08/2014 | |
| 462,015 TOTAL UNIVERSE / BASE RATE | $110.00/M | |
| 462,015 ACTIVE SUBSCRIBERS | $110.00/M | |

**DESCRIPTION**

Published by American Media, Inc.

The American Media Practicing CatholicsDatabase reaches devout men and women of Catholic faith. They attend mass and church services on a regular basis and strive to live according to scripture. They purchase religious products ranging from Bibles to religious wall decor.

The consumers in this list are comprised of devout Catholics who are also subscribers to a variety of American Media celebrity journalism and health and fitness magazines. They want to achieve a balance of physical, emotional, and spiritual health. Catholics attend mass, go to confession, and receive communion at churches and cathedrals. They meet regularly for prayer meetings, Bible study groups, and attend socials held at their place of worship. They send their children to Catholic school and follow the religious teachings of the pope, bishops, priests and nuns. They are also generous donors when it comes to volunteering their time or money to support their church, Catholic charities, and fellow Catholics. They celebrate the birth and resurrection of Christ, lent, and Palm Sunday.

Practicing Catholics purchase a variety of religious items to display devotion to their religion. They buy rosaries, Bibles, hymnals, holy water, prayer books, crucifixes, religious apparel, calendars, candles, incense, Christian music, nativity scenes, jewelry, posters, sculptures, painting, bumper stickers, and collectibles. When traveling, Catholics attend services at neighboring churches. Many Catholics also make the pilgrimage to Rome to visit the Vatican and purchase airfare and related travel accessories.

Individuals in the American Media Practicing CatholicsDatabase are receptive to marketing offers from retailers, direct mail and email marketers, consumer publications, apparel manufacturers, travel coordinators, religious organizations, and non-profit groups.

**ORDERING INSTRUCTIONS**

| | |
|---|---|
| MARKET: | CONSUMER |
| CHANNELS: | |
| SOURCE: | DIRECT RESPONSE |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | PREFERRED PROVIDER |
| GEO: | USA |

| SELECTS | |
|---|---|
| 1 MONTH HOTLINE | $16.00/M |
| 3 MONTH HOTLINE | $11.00/M |
| 3RD PARTY BLOW-IN | $10.00/M |
| 6 MONTH HOTLINE | $5.00/M |
| AGE | $11.00/M |
| ETHNIC | $15.00/M |
| GENDER | $10.00/M |
| INCOME | $11.00/M |
| LIFESTYLE | $11.00/M |
| PUBLICATIONS | $11.00/M |
| SCF | $10.00/M |
| SOURCE | $10.00/M |
| STATE | $10.00/M |
| ZIP | $10.00/M |

| ADDRESSING | |
|---|---|
| KEY CODING | $3.00/M |
| EMAIL | $100.00/F |
| FTP | $100.00/F |
| P/S LABELS | $10.00/M |
| RUN CHARGE | $10.00/M |

**RELATED LISTS**

- DONORS TO CATHOLIC CAUSES
- ST. LAWRENCE SEMINARY ENGLISH SPEAKING DONORS
- GRAYMOOR-FRANCISCAN FRIARS OF THE ATONEMENT DONORS
- RELIGION & SPIRITUALITY EDITORIAL BUYERS
- ST. BENEDICT'S ABBEY
- BOYS TOWN DONORS
- BOYS TOWN CATHOLIC DONORS
- ST. LAWRENCE SEMINARY - SPANISH SPEAKING DONORS
- THE PROVINCE OF ST. MARY OF THE CAPUCHIN ORDER
- LEAFLET MISSAL CATALOG BUYERS

*See* Complaint Ex. D.

     6.    Defendants even offer access to their "Community Charity Donors Database Mailing List," which purportedly reaches "an altruistic group who volunteer their time and money to charities that benefit the people in their home towns and surrounding cities."

*See* Complaint Ex. E.

7.      Michigan's PPPA clearly prohibits what Defendants have done.  Section 2 of the

PPPA provides:

> [A] person, or an employee or agent of the person, engaged in the
> business of selling at retail, renting, or lending books or other
> written materials ... *shall not disclose* to any person, other than the
> customer, a record or information concerning the purchase ... of
> those materials by a customer that indicates the identity of the
> customer.

M.C.L. § 445.1712 (emphasis added).

8.      Accordingly, Plaintiff brings this Class Action Complaint against Defendants for

their intentional and unlawful disclosure of their customers' Personal Reading Information in

violation of the PPPA, and for unjust enrichment.

## NATURE OF THE CASE

9.      To supplement their sales and advertising revenues, Defendants sell their

subscribers' personal information—including their full names, titles of magazines subscribed to,

and home addresses (collectively "Personal Reading Information"), as well as myriad other

personal, lifestyle, and demographic information such as gender, age, ethnicity, income, religion,

parental status, and political affiliation—to data miners and other third parties without the written

consent of their customers.

10.      Defendants' disclosure of Personal Reading Information, and other personal,

demographic, and lifestyle information is not only unlawful, but also dangerous because it allows

for the targeting of particularly vulnerable members of society.  In fact, anyone can buy a

customer list from Defendants that contains a number of categories of detailed subscriber

information.  For example, a purchaser could buy a list with the names and addresses of all *OK!*

subscribers who are Catholic, single, over the age of 80, with a net worth of greater than

$500,000, no pets in the household, and a history of charitable donations. Defendants would sell such a list for approximately $180 per thousand subscribers listed.

11.     While Defendants profit handsomely from the unauthorized sale and disclosure of their customers' Personal Reading Information and other personal information, they do so at the expense of their subscribers' privacy and statutory rights because Defendants do not obtain their customers' written consent prior to selling their Personal Reading Information.

## PARTIES

12.     Plaintiff Elizabeth Moeller is a natural person and citizen of the State of Michigan. Plaintiff Moeller is a subscriber to the *National Enquirer* and *OK!* magazines, which are published by Defendants. Prior to and at the time she subscribed to the *National Enquirer* and *OK!*, Defendants did not notify Plaintiff Moeller that they disclose the Personal Reading Information of their customers, and Plaintiff Moeller has never authorized Defendants to do so. Furthermore, Plaintiff Moeller was never provided any written notice that Defendants sell their customers' Personal Reading Information, or any means of opting out. Since subscribing to the *National Enquirer* and *OK!*, and continuing to present, Defendants have disclosed, and continue to disclose, without consent or prior notice, Plaintiff Moeller's Personal Reading Information to data mining companies including Insource and others, who then supplement that information with data from their own files. Moreover, during that same period, Defendants have sold – and continue to sell and offer for sale – mailing lists containing Plaintiff Moeller's Personal Reading Information to third parties seeking to contact Defendants' subscribers, without first obtaining Plaintiff Moeller's written consent or even giving her prior notice of the disclosure and sales. Because Defendants sold and disclosed her Personal Reading Information, Plaintiff Moeller now receives junk mail and telephone solicitations offering discounted magazine subscriptions, among other things. These unwarranted offers waste Plaintiff Moeller's time, money, and

resources.  These harassing junk mail offerings and phone call solicitations received by Plaintiff

Moeller are attributable to Defendants' unauthorized sale and disclosure of her Personal Reading

Information.  Because Plaintiff Moeller is entitled by law to privacy in her Personal Reading

Information, and because she paid money for her subscription, Defendants' sale of her Personal

Reading Information deprived Plaintiff Moeller of the full set of benefits to which she was

entitled as a part of her *National Enquirer* and *OK!* subscriptions, thereby causing economic

harm.  Accordingly, what Plaintiff Moeller received (a subscription without statutory privacy

protections) was less valuable than what she paid for (a subscription with accompanying statutory

privacy protections), and she would not have been willing to pay as much, if at all, for her

*National Enquirer* and *OK!* subscriptions had she known that Defendants would disclose her

Personal Reading Information.

13.    Defendant American Media, Inc., is a Delaware corporation with its principal

place of business at 4 New York Plaza, New York, NY 10004.  American Media does business

throughout Michigan, New York, and the entire United States.

14.    Defendant Odyssey Magazine Publishing Group, Inc., is a Delaware corporation

with its principal place of business at 4 New York Plaza, New York, NY 10004.  Odyssey is a

wholly owned subsidiary of America Media.  Odyssey does business throughout Michigan, New

York, and the entire United States.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this civil action pursuant to 28

U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in

controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class

member is a citizen of a state different from Defendants.  This Court has supplemental

jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

16.    This Court has personal jurisdiction over Defendants because Defendants conduct substantial business within New York, such that Defendant have significant, continuous, and pervasive contacts with the State of New York. Additionally, Defendants' principal places of business are in New York, New York.

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do substantial business in this District, a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District, and Defendants' principal places of business are in this District.

## FACTUAL BACKGROUND

### *Michigan's Preservation of Personal Privacy Act*

18.    In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and written materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

19.    Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the PPPA "to preserve personal privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information. H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

20.    Section 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in
> the business of selling at retail, renting, or lending books or

> other written materials . . . *shall not disclose* to any person,
> other than the customer, a record or information concerning the
> purchase . . . of those materials by a customer that indicates the
> identity of the customer.

M.C.L. § 445.1712 (emphasis added).

21.     Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye." S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

22.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988).

23.     Senator Leahy also explained why choices in movies and reading materials are so private: "These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

24.     Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit A**).

10

25.     Despite the fact that thousands of Michigan residents subscribe to Defendants publications, Defendants disregard their legal responsibility by systematically violating the PPPA.

***The Personal Information Market: Consumers' Personal Information Has Real Value***

26.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[3]

27.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[4]

28.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[5]

29.     In fact, an entire industry exists where companies known as data miners purchase, trade, and collect massive databases of information about consumers. Data miners

---

[3] The Information Marketplace: Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited March 17, 2016).

[4] *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274 .html (last visited March 17, 2016).

[5] Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited March 17, 2016) (emphasis added).

then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[6]

30.    The scope of data miners' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[7]

31.    Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[8]

32.    Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi- Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[9]

---

[6] *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited March 17, 2016).

[7] Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited March 17, 2016).

[8] Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited March 17, 2016).

[9] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited March 17, 2016).

33.     In their letter, the co-Chairmen recognized that:

> By combining data from numerous offline and online sources, data
> brokers have developed hidden dossiers on every U.S. consumer.
> This large[-]scale aggregation of the personal information of
> hundreds of millions of American citizens raises a number of
> serious privacy concerns.[10]

34.     Data mining is especially troublesome when consumer information is sold to
direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers
often use consumer information to lure unsuspecting consumers into various scams,[11] including
fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Defendants
share information with data miners and direct-mail advertisers, they contribute to the "[v]ast
databases of names and personal information" that are often "sold to thieves by large publicly
traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers"
and other criminals.[12]

35.     Information disclosures like Defendants' are particularly dangerous to the
elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are
often at home, rely on delivery services, and are lonely for the companionship that telephone
callers provide."[13]  The FTC notes that "[t]he elderly often are the deliberate targets of
fraudulent telemarketers who take advantage of the fact that many older people have cash

---

[10] *Id.*

[11] *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited March 17, 2016).

[12] Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0 (last visited March 17, 2016).

[13] *Id.*

13

reserves or other assets to spend on seemingly attractive offers."[14]

36.    Indeed, an entire black market exists where the personal information of vulnerable elderly Americans is exchanged.  Thus, information disclosures like Defendants' are particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[15]

37.    Defendants are not alone in jeopardizing their subscribers' privacy and well-being in exchange for increased revenue:  disclosing subscriber information to data miners, direct marketers, and other third parties is a widespread practice in the publishing industry.

38.    Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth.  Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases

39.    As the data mining industry has grown, so too have consumer concerns regarding the privacy of their personal information.

40.    A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they

---

[14] *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited March 17, 2016).

[15] *See id.*

believe do not protect their privacy online.[16]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[17]

41.    Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy- protective competitors.

42.    In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[18]

43.    These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[19]

44.    Thus, in today's economy, individuals and businesses alike place a real,

---

[16] *See 2013 TRUSTe US Consumer Confidence Index*, TRUSTe, http://www.truste.com/us-consumer-confidence-index-2013/ (last visited March 17, 2016).

[17] *Id.*

[18] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited March 17, 2016).

[19] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited March 17, 2016).

quantifiable value on consumer data and corresponding privacy rights.[20]  As such, where a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### Defendants Unlawfully Sell Their Subscribers' Personal Reading Information

45.    Defendants maintain a vast digital database comprised of their subscribers' Personal Reading Information.  Defendants disclose their subscribers' Personal Reading Information to data mining companies including Insource and others, who then supplement that information with additional sensitive personal information about each of Defendants subscriber, including gender, purchasing habits, religious practice, charitable donations, and (when applicable) number, age, and gender of the subscriber's children.  (*See, e.g.*, **Exhibits B-E**).

46.    Defendants then sell their mailing lists—which include subscribers' Personal Reading Information identifying which individuals purchased which magazines, and can include the sensitive information obtained from data miners—to data miners, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibits B–E**).

47.    As a result of Defendants' data compiling and sharing practices, companies can purchase mailing lists from Defendants that identify Defendants' subscribers by their most intimate details:  income, religious practice, and charitable donations.  Defendants' disclosure of such sensitive and personal information puts consumers, especially the more vulnerable

---

[20] *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at*
http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited March 17, 2016) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

members of society, at risk of serious harm from scammers. For example, Defendants will sell—to anyone willing to pay for it—a list with the names and addresses of all *OK!* subscribers who are Catholic, single, over the age of 80, with a net worth of greater than $500,000, no pets in the household, and a history of charitable donations.

48.    Defendants do not seek their subscribers' prior written consent to any of these disclosures and their subscribers remain unaware that their Personal Reading Information and other sensitive personal information is being bought and sold on the open market.

49.    Consumers can sign up for Defendants' subscriptions through numerous media outlets, including the Internet, telephone, or traditional mail. Regardless of how the consumer subscribes, Defendants never require the individual to read or agree to any terms of service, privacy policy, or information-sharing policy. Consequently, Defendants uniformly fail to obtain any form of consent from – or even provide effective notice to – their subscribers before disclosing their Personal Reading Information.

50.    As a result, Defendants disclosed and continue to disclose their customers' Personal Reading Information – including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[21] – to anybody willing to pay for it.

51.    By and through these actions, Defendants have intentionally disclosed to third parties their Michigan subscribers' Personal Reading Information without consent, in direct violation of the PPPA with Plaintiff and other members of the Class.

---

[21] *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited March 17, 2016).

## CLASS ACTION ALLEGATIONS

52.     Plaintiff seeks to represent a class defined as all Michigan residents who had their Personal Reading Information disclosed to third parties by Defendants without consent (the "Class").  Excluded from the Class is any entity in which Defendants have a controlling interest, and officers or directors of Defendants.

53.     Plaintiff also seeks to represent a class defined as all Michigan residents who had their Personal Reading Information disclosed to third parties by American Media without consent (the "American Media Class").  Excluded from the American Media Class is any entity in which American Media has a controlling interest, and officers and directors of American Media

54.     Plaintiff also seeks to represent a class defined as all Michigan residents who had their Personal Reading Information disclosed to third parties by Odyssey without consent (the "Odyssey Class").  Excluded from the Odyssey Class is any entity in which Odyssey has a controlling interest, and officers or directors of Odyssey.

55.     Members of the Classes are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Classes number in the thousands.  The precise number of Class, American Media Class, and Odyssey Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants.

56.     Common questions of law and fact exist as to all members of the Classes and predominate over questions affecting only individual members of the Classes.  Common legal and factual questions include, but are not limited to:  (a) whether Defendants are "engaged in the

business of selling at retail" books or other written materials (*i.e.*, magazines); (b) whether Defendants obtained consent before disclosing to third parties Plaintiff's and the Classes' Personal Reading Information; (c) whether Defendants' disclosure of Plaintiff's and the Classes' Personal Reading Information violated the Preservation of Personal Privacy Act, M.C.L. § 445.1712; and (d) whether Defendants' sale of Plaintiff's and the Classes' Personal reading Information constitutes unjust enrichment.

57.    The claims of the named Plaintiff are typical of the claims of the Classes in that the named Plaintiff and the Classes sustained damages as a result of Defendants' uniform wrongful conduct, based upon Defendants' disclosure of Plaintiff's and the Classes' Personal Reading Information.

58.    Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the members of the Classes she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of members of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

59.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes.  Each individual member of the Classes may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single

19

adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**COUNT I**
**Violation of the Preservation of Personal Privacy Act**
**(M.C.L. § 445.1712)**

60.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

61.     Plaintiff brings this claim individually and on behalf of members of the Class against Defendants.

62.     Plaintiff also brings this claim individually and on behalf of members of the American Media Class against American Media.

63.     Plaintiff also brings this claim individually and on behalf of members of the Odyssey Class against Odyssey.

64.     As magazine publishers that sell subscriptions to consumers, Defendants are engaged in the business of selling written materials at retail. *See* M.C.L. § 445.1712.

65.     By subscribing to the *National Enquirer* and *OK!* magazines, Plaintiff purchased written materials directly from Defendants. *See* M.C.L. § 445.1712.

66.     Because Plaintiff purchased written materials directly from Defendants, she is a "customer" within the meaning of the PPPA. *See* M.C.L. § 445.1711(a).

67.     At all times relevant, and beginning on the dates Plaintiff initiated her *National Enquirer* and *OK!* subscriptions, Defendants disclosed Plaintiff's Personal Reading Information, which identified her as a *National Enquirer* and *OK!* subscriber, in at least two ways.

68.     First, Defendants disclosed mailing lists containing Plaintiff's Personal Reading

20

Information to data mining companies including Insource, and others, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Defendants.

69.    Second, Defendants sold their mailing lists containing Plaintiff's Personal Reading Information—enhanced with additional information from data miners—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

70.    Because the mailing lists included the additional information from the data miners, the lists were more valuable, and Defendants were able to increase their profits gained from the mailing list sales.

71.    By selling or otherwise disclosing their subscriber lists, Defendants disclosed to persons other than Plaintiff records or information concerning her purchase of written materials from Defendants.  *See* M.C.L. § 445.1712.

72.    The information Defendants disclosed indicates Plaintiff's name and address, as well as the fact that she subscribed to the *National Enquirer* and *OK!*.  Accordingly, the records or information disclosed by Defendants indicate Plaintiff's identity.  *See* M.C.L.§ 445.1712.

73.    Plaintiff and the members of the Classes never consented to Defendants disclosing their Personal Reading Information to anyone.

74.    Worse yet, Plaintiff and the members of the Classes did not receive notice before Defendants disclosed their Personal Reading Information to third parties.

75.    On information and belief, Defendants' disclosures of Plaintiff's and the Classes' Personal Reading Information were not made pursuant to a court order, search warrant, or grand jury subpoena.

76.     Defendants' disclosures of Plaintiff's and the Classes' Personal Reading Information were not made to collect payment for their subscriptions.

77.     Defendants' disclosures of Plaintiff's Personal Reading Information were made to data miners, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase Defendants' revenue.  Accordingly, Defendants' disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Classes.

78.     By disclosing Plaintiff's Personal Reading Information, Defendants violated Plaintiff's and the Classes' statutorily-protected right to privacy in their reading habits.  *See* M.C.L. § 445.1712.

79.     Additionally, because Plaintiff and the members of the Classes paid for their subscriptions to Defendants' magazines, and Defendants were obligated to comply with the PPPA, Defendants' unlawful disclosure of Plaintiff's and the other members of the Classes' Personal Reading Information deprived Plaintiff and the members of the Classes the full value of their paid-for subscriptions.  Because Plaintiff and the other members of the Classes ascribe monetary value to the privacy of their Personal Reading Information, Defendants' unlawful sale and disclosure of their Personal Reading Information caused them to receive less value than they paid for, thereby causing them economic harm.

80.     Likewise, because Plaintiff and the other members of the Classes ascribe monetary value to the privacy of their Personal Reading Information, a magazine subscription that keeps their Personal Reading Information private is more valuable than one that does not.

81.     Accordingly, had Plaintiff been adequately informed of Defendants' disclosure practices, she would not have been willing to purchase her *National Enquirer* and *OK!*

subscriptions at the price charged, if at all.  Thus, Defendants' unlawful disclosures caused

Plaintiff economic harm.

82.    Defendants' disclosure of Plaintiff's Personal Reading Information to third parties

has also caused an influx of third party print advertisements and marketing calls to her cellular

phone.

83.    As a result of Defendants' unlawful and continued disclosure of their Personal

Reading Information, Plaintiff and the members of the Classes have suffered privacy and

economic injuries.  On behalf of herself and the Classes, Plaintiff seeks:  (1) an injunction

requiring Defendants to obtain consent from Michigan subscribers prior to the disclosure of their

Personal Reading Information as required by the PPPA; (2) actual damages, including

disgorgement, or $5,000.00, whichever is greater, per member of the Classes, pursuant to M.C.L.

§ 445.1715(a); and (3) costs and reasonable attorneys' fees pursuant to M.C.L. § 445.1715(b).

## COUNT II
### Unjust Enrichment

84.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set

forth herein.

85.    Plaintiff brings this claim individually and on behalf of the members of the Class

against Defendants.

86.    Plaintiff brings this claim individually and on behalf of the members of the

American Media Class against American Media.

87.    Plaintiff also brings this claim individually and on behalf of the members of the

Odyssey Class against Odyssey.

88.    Plaintiff and the members of the Classes conferred benefits on Defendants by

providing Defendants with their Personal Reading Information and paying Defendants for their

magazine subscriptions.  Defendants received and retained the information and money belonging to Plaintiff and the Classes when Plaintiff and the other members of the Classes subscribed to Defendants' publications.

89.    Because Defendants received and processed Plaintiff's and the Classes' subscription payments and Personal Reading Information, and because Defendants have employees handling customer accounts and billing as well as customer data, Defendants appreciate or have knowledge of such benefits.

90.    Under the PPPA, Plaintiff and the members of the Classes were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

91.    Under principles of equity and good conscience, because Defendants failed to comply with the PPPA, Defendants should not be allowed to retain the full amount of money Plaintiff and the Classes paid for their subscriptions or the money it received by selling Plaintiff's and the Classes' Personal Reading Information.

92.    Plaintiff and the other members of the Classes have suffered actual damages as a result of Defendants' unlawful conduct in the form of the value Plaintiff and the other members of the Classes paid for and ascribed to the confidentiality of their Personal Reading Information. This amount is tangible and will be calculated at trial.

93.    Additionally, Plaintiff and the members of the Classes have suffered actual damages inasmuch as Defendants' failure to inform them that they would disclose their Personal Reading Information caused them to purchase magazine subscriptions when they otherwise would not have.

94.    Further, a portion of the purchase price of each Defendants' magazine subscriptions sold to Plaintiff and the other members of the Classes was intended to ensure the

confidentiality of Plaintiff's and the Classes' Personal Reading Information, as required by the

PPPA. Because Plaintiff and the other members of the Classes were denied services that they

paid for and were entitled to receive—i.e., confidentiality of their Personal Reading

Information—and because Plaintiff and the Classes would have commanded a discount to

voluntarily forego those benefits, they incurred actual monetary damages.

95.    To prevent inequity, Defendants should return to Plaintiff and the Classes the

value they ascribe to confidentiality of their Personal Reading Information and all money derived

from Defendants' sale and disclosure of Plaintiff's and the Classes' Personal Reading

Information.

96.    Accordingly, Plaintiff and the members of the Classes seek an order declaring that

Defendants' conduct constitutes unjust enrichment, and awarding Plaintiff and the Classes

restitution in an amount to be calculated at trial equal to the amount of money obtained by

Defendants through their sale and disclosure of Plaintiff's and the Classes' Personal Reading

Information.

## **PRAYER FOR RELIEF**

97.    WHEREFORE, Plaintiff, individually and on behalf of all others similarly

situated, seeks a judgment against Defendants as follows:

A.    For an order certifying the Classes under Rule 23 of the Federal
Rules of Civil Procedure and naming Plaintiff as representative of
the Classes and Plaintiff's attorneys as Class Counsel to represent
the Classes.

B.    For an order declaring that Defendants' conduct as described herein
violates the Preservation of Personal Privacy Act, M.C.L. §
445.1712;

C.    For an order finding in favor of Plaintiff and the Classes on all
counts asserted herein;

D.      For an award of actual damages, including disgorgement and restitution, or $5,000, whichever is greater, to Plaintiff and each member of the Classes, as provided by the Preservation of Personal Privacy Act, M.C.L. § 445.1715(a);

E.      For prejudgment interest on all amounts awarded;

F.      For an order of restitution and all other forms of equitable monetary relief;

G.      For injunctive relief as pleaded or as the Court may deem proper; and;

H.      For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  March 18, 2016

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:  */s/ Joseph I. Marchese*
       Joseph I. Marchese

Scott A. Bursor
Joseph I. Marchese
Philip L. Fraietta
888 Seventh Avenue
New York, NY  10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
       jmarchese@bursor.com
       pfraietta@bursor.com

*Attorneys for Plaintiff*